UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CHARLES KWADZO SOKPA-ANKU, A098-758-438, <br><br>Petitioner,<br><br>v.<br><br>JOE PAGET, Supervisor of the Immigration Detention Facility; JACK G. SERIER, Ramsey County Sheriff; MICHAEL FEINBERG, Special Agent in Charge, U.S. Immigration & Customs Enforcement; SCOTT BANIECKE, Filed Officer Director, ICE; THOMAS D. HOMAN, Director of ICE; JOHN F. KELLY, Secretary of the Department of Homeland Security (DHS); and JEFFERSON B. SESSIONS, U.S. Attorney General;<br><br>Respondents. | Case No. 0:17-cv-01107-DWF-KMM <br><br><br><br>**REPORT AND RECOMMENDATION** |

Charles Kwadzo Sokpa-Anku is a native and citizen of Ghana who is subject to a final order of removal from the United States. He has been in the continuous custody of immigration authorities since September 14, 2016. He seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241 and *Zadvydas v. Davis*, 533 U.S. 678 (2001), requiring his release pending his removal. [Pet., ECF No. 1.] The Respondents argue that Mr. Sokpa-Anku is not entitled to a writ of habeas corpus because there is a substantial likelihood of his removal in the reasonably foreseeable future. [*See, e.g.*,

1

Resp. to Pet., ECF No. 11.] For the reasons that follow, the Court recommends that Mr. Sokpa-Anku's petition be granted.

## I. Background

Immigration authorities have had a difficult time removing Mr. Sokpa-Anku from the United States. Since his removal order, he has been in custody for two separate and lengthy periods of detention. On one occasion, he failed to comply with immigration officials' efforts to remove him from the United States, but he has been in custody for more than twenty-one months since that single incident of non-compliance occurred. There is no demonstration on the record before the Court that immigration authorities are any closer to obtaining a current travel document from Ghana for Mr. Sokpa-Anku than they were over a year ago.

### *First Period of Post-Removal-Order Detention*

Sometime after Mr. Sokpa-Anku arrived in the United States legally, he was "convicted of three counts of Medical Assistance Fraud and Attempted Theft of Public Funds" in state court and was ordered to pay restitution. [Pet. ¶ 16.] United States Immigration & Customs Enforcement ("ICE") officials took him into custody on March 5, 2015 for removal proceedings. [*Id.* ¶ 17.] On May 7, 2015, an Immigration Judge denied Mr. Sokpa-Anku's request to terminate the removal proceedings and the Board of Immigration Appeals dismissed his appeal. [*Id.* ¶ 19.] The removal order therefore became final on September 11, 2015. [*Id.*]

During this first period of detention, Mr. Sokpa-Anku remained in ICE custody for approximately sixteen months, almost nine months of which was after the final order of removal. In June 2016, shortly after he filed a habeas petition challenging the length of detention, ICE released him on conditions of supervision. [Pet. ¶ 20–21.]

### Second Period of Detention and Failure to Comply

ICE detained Mr. Sokpa-Anku again on September 14, 2016 after it acquired Ghanaian travel documents that would enable his deportation. [Pet. ¶ 22.] ICE attempted to remove Mr. Sokpa-Anku from the United States on September 20, 2016, at the Minneapolis-St. Paul International Airport, but he did not board the plane. [*Id.* ¶ 23; Decl. of Xiong Lee ("Lee Decl.") ¶ 21, ECF No. 12.] According to Respondents, he "deliberately refused to comply with ICE Officers by physically resisting and refusing to board his flight." [Lee Decl. ¶ 21.] Mr. Sokpa-Anku asserts that he did not physically struggle with ICE agents, but he stopped walking toward the gate and told the agents he would not board the plane. [Pet'r Decl. (May 23, 2017) ¶¶ 15–18, ECF No. 15 at 8–11.] Six days after the failed removal attempt, the Ghana Embassy invalidated Mr. Sokpa-Anku's travel document because he had a pending

3

proceeding in the Minnesota Court of Appeals for post-conviction relief.[1] [Lee Decl. ¶ 22.]

Because he did not board the plane on September 20, 2016, ICE served him with a warning for failure to depart on October 7, 2016 and warned him of the potential consequences of continued refusal to comply with efforts to remove him to Ghana. [Lee Decl. ¶ 25.] In December 2016, because he had been in post-removal-order detention since September 14, 2016, ICE served Mr. Sokpa-Anku with a custody review decision advising him that he would remain in custody beyond the expiration of the 90-day removal period. [Lee Decl. ¶ 28.] ICE was "continuing efforts to obtain a travel document," so it concluded that "there was a significant likelihood of removal in the reasonably foreseeable future. . . ." [Lee Decl. ¶ 28.] ICE issued monthly notices of failure to comply with removal efforts between November 2016 and May 2017. [Lee Decl. ¶¶ 29–34; Pet'r's Exs.C–H, ECF No. 1-1 at 6–17.; Pet'r's Ex. I, ECF No. 15.] However, there is no allegation that after refusing to board the plane on September 20, 2016, Mr. Sokpa-Anku ever again willfully refused to comply with efforts to remove him from the United States. Indeed, the record demonstrates that both before and after September of 2016, Mr. Sokpa-Anku complied with ICE's efforts to remove him. [Pet'r Decl. ¶¶ 20, 28.]

---

[1] Mr. Sokpa-Anku's request for post-conviction relief was unsuccessful; the Minnesota Court of Appeals denied his petition on November 28, 2016. [Lee Decl. ¶ 26.]

4

*ICE's Continued Removal Efforts*

As noted above, Ghana issued a travel document for Mr. Sokpa-Anku on August 8, 2016, but on September 26, 2016, it cancelled that travel document "pending the outcome of his post-conviction relief hearing with the MN Court of Appeals." [Lee Decl. ¶¶ 17, 22.] The Respondents represent that on April 26, 2017, about two weeks after he filed his second habeas petition commencing this case, the Consulate General of Ghana agreed to issue a travel document for Mr. Sokpa-Anku. [Lee Decl. ¶ 35.]

On August 7, 2017, Mr. Sokpa-Anku received a notice from ICE that it had decided to continue his detention because ICE was working with the Government of Ghana to obtain a travel document. [Letter from B. Casper Sanches to Menendez, M.J. (Sept. 22, 2017), ECF No. 17.] ICE transferred him from the Sherburne County Detention Facility to the Pine Prairie ICE Processing Center in Pine Prairie, Louisiana. [*Id.*] Mr. Sokpa-Anku was told that this transfer was due to a lack of bed space, not to effect his removal. [*Id.*] Mr. Sokpa-Anku was transferred to various other facilities between June and September of 2017. [Letter from B. Casper Sanchez to Menendez, M.J. (Dec. 13, 2017), ECF No. 20.] These transfers inexplicably included: (1) a June 6, 2017 transfer from Minnesota to Louisiana; (2) a June 7, 2017 tranfer from Louisiana to Arizona; (3) a June 15, 2017 transfer from Airzona back to Louisiana; (4) a June 20, 2017 transfer from Louisiana back to Minnesota; (5) a

5

September 26, 2017 transfer from Pine Prairie, Louisiana, to Jena, Louisiana; and (6) a September 27, 2017 transfer to the Etowah Detention Center in Alabama. [*Id.*]

On October 2, 2017, in a letter from Respondents' counsel, Respondents asserted that ICE was "continuing its efforts to have the government of Ghana re-issue the travel document for Mr. Sokpa-Anku." [Letter from A. Voss to Menendez, M.J. (Oct. 2, 2017), ECF No. 19.]

Despite not having a travel document in hand, Respondents assert that they have scheduled Mr. Sokpa-Anku on two charter flights to Ghana, though they have failed to ever remove him. The ICE official supervising the deportation officer assigned to Mr. Sokpa-Anku's case, Tonita Dupard North, states: "[o]n May 12, 2017, ICE ERO Headquarters Removal and International Operations advised the local ICE ERO that the Embassy of Ghana would be issuing a travel document." [Decl. of Tonita Dupard North ("North Decl.") ¶ 4.] Still waiting on a travel document about a month later, Mr. Sokpa-Anku "was scheduled for a charter flight[] for June 13, 2017." However, one day before the scheduled flight his name was removed from the list of passengers because he had applied for a stay of removal with the United States Supreme Court.[2] [North Decl. ¶¶ 5–7.] There is no evidence that a travel document issued before this first chartered flight, and in July of 2017, Officer North again

---

[2] The Supreme Court denied the request on June 26, 2017. [North Decl. ¶ 8.] Between December of 2017 and February of 2018, Mr. Sokpa-Anku's *pro se* efforts to obtain review from the Ninth Circuit Court of Appeals, which transferred his request to the Eighth Circuit, also turned out to be unsuccessful. [North Decl. ¶¶ 17–20.]

6

received assurance from ICE headquarters "that the issuance of a travel document was likely." [North Decl. ¶ 9.]

The second chartered flight to Ghana was more recent. As of October 2, 2017, Officer North learned that "the travel document was pending a decision by the Embassy of Ghana." [North Decl. ¶ 12.] On March 7, 2018, Respondents stated that "Petitioner's removal is scheduled for this month via charter flight." [Resp't's Status Report at 1, ECF No. 22; North Decl. ¶ 21 ("The Petitioner is scheduled to be removed via charter flight later this month. His removal from the United States is imminent.").] Again, there is no indication that a travel document issued before the March 2018 charter flight. Indeed, when Mr. Sokpa-Anku requested information about the status of his travel documents in March, ICE officials informed him that he would "be deported as soon as Ghana issues a travel document." [Letter from B. Casper Sanchez to Menendez, M.J. (Apr. 16, 2018), Attach., ECF No. 28.] As recently as April 13, 2018, Mr. Sokpa-Anku had still not been removed and he remains detained by ICE at the Etowah County Jail in Alabama. [*Id*.]

## II. Legal Standard

After a person is subject to a final order of removal, the immigration laws require the Attorney General to hold him in custody for a 90-day removal period. 8 U.S.C. § 1231(a)(2). After that 90-day removal period ends, the government may continue detaining a person if he is removable because of convictions for certain criminal offenses or if the Attorney General determines he is a risk to the community

7

or is unlikely to comply with the order of removal. *Id.* § 1231(a)(6). But even in those circumstances, the United States Constitution prevents such detention from going on indefinitely. *Zadvydas*, 53 U.S. at 699–700.

Once a person is finally ordered removed from the United States, it is presumptively constitutional for the government to detain him for a 6-month period. *Id.* at 701. "After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* "[A]s the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future,' conversely would have to shrink." *Id.* "[A]n alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

### III. Discussion

Mr. Sokpa-Anku has now been in custody well beyond the presumptively reasonable six-month period. He has been detained since September 14, 2016. At the time he filed his second habeas petition on April 10, 2017, he had been in post-removal-order detention for seven months. It is now June 8, 2018, and Mr. Sokpa-Anku has been in detention for nearly twenty-one months. Still the record shows that no Ghanaian travel document has issued. Mr. Sokpa-Anku should be released.

### *Mr. Sokpa-Anku's Initial Burden*

For several reasons, the Court concludes that Mr. Sokpa-Anku has met his initial burden of providing good reason to believe that there is no significant likelihood of his removal in the reasonably foreseeable future. First, the Respondents replied to the habeas petition in this case over a year ago in May of 2017, asserting that Ghana had agreed to issue a travel document. Not only is Mr. Sokpa-Anku still in the United States, but there is no indication that any travel document has been issued, nor any recent reassurance from Ghana that a travel document is forthcoming. Second, the full record here suggests that Respondents have had significant difficulty in getting Mr. Sokpa-Anku deported on more than one occasion. As described in the habeas petition, the first time Mr. Sokpa-Anku was detained after his removal order became final, ICE was unable to remove him for about sixteen months. Only after he filed a petition for habeas corpus was he released on conditions. And despite moving him repeatedly between facilities and booking him on at least two charter flights, still no deportation has occurred. Third, the passage of almost two years since Mr. Sokpa-Anku's failure to board the plane in September of 2016 provides strong support for his position. Although the passage of time alone is perhaps insufficient to establish a petitioner's initial burden under *Zadvydas*, here it does not stand alone at all. Combined with the other considerations addressed above, there is ample reason to believe there is no significant likelihood Mr. Sokpa-Anku will be removed in the reasonably foreseeable future.

The Respondents disagree that Mr. Sokpa-Anku has met his initial burden because he once refused to board a plane to Ghana on September 20, 2016. [*See* Resp. to Pet. at 10–12.] This argument fails for several reasons. First, Mr. Sopka-Anku's refusal to board the plane to Ghana occurred nearly twenty-one months ago. Since that time, ICE has been unable to obtain a travel document from Ghana despite repeated assertions that the government expected to receive one soon and despite Mr. Sokpa-Anku's cooperation since that time.

Second, the authority upon which the Respondents rely is distinguishable because in those cases the detainees' non-cooperation was ongoing.[3] For example, in *Moses v. Lynch*, No. 15-cv-4168 (PAM/JJK), 2016 WL 2636352, at *1–2 (D. Minn. Apr. 12, 2016),[4] Mr. Moses was subject to a final order of removal in March of 2015, received a travel document in November of 2015, was brought to a plane twice in December of 2015, and on both occasions he refused to comply with efforts to

---

[3] *See Kanteh v. Ridge*, No. 05-cv-0313 (DWF/AJB), 2005 WL 1719217, at *3–4 (D. Minn. June 30, 2005) (concluding that Mr. Kanteh could not meet his initial burden under *Zadvydas* where, after he was arrested in November of 2003 and told to cooperate with attempts to obtain a travel document from Gambia, he never "made any sincere continuing effort to obtain travel documents as a counter to the agency's well-founded allegation of non-cooperation, and such inaction may appropriately be construed as a continuing failure to cooperate"), *report and recommendation adopted*, No. 05-cv-0313 (DWF/AJB), 2005 WL 1705526 (D. Minn. July 19, 2005).

[4] The report and recommendation in *Moses*, was adopted by the District Court on May 5, 2016. No. 15-cv-4168 (PAM/JJK), 2016 WL 2596020 (D. Minn. May 5, 2016).

remove him to Nigeria. He filed his habeas petition amid this ongoing obstruction. The court in *Moses* was not faced with an individual who had been detained for nearly two additional years after a single failure to comply with removal efforts, which is the situation presented in Mr. Sokpa-Anku's case.

Indeed, counsel for Respondents conceded at the hearing that the government cannot constitutionally detain a person indefinitely after a single instance of non-compliance with removal efforts followed by an unbroken period without additional obstruction. [Digital Recording of Hr'g (Apr. 16, 2018) at 9:18.][5] Although Mr. Sokpa-Anku's initial refusal certainly reset the clock on the period of detention relevant for *Zadvydas* analysis, it did not permanently vitiate Mr. Sokpa-Anku's due process protections.

Third, the record shows that Mr. Sokpa-Anku's failure to cooperate with ICE officials at the airport almost two years ago is not responsible for his prolonged detention. Indeed, the Respondents' own showing demonstrates that Ghana considered Mr. Sokpa-Anku's travel document "null and void" on September 26, 2016, not because he refused to get on the plane six days before, but because he had a pending post-conviction proceeding at the Minnesota Court of Appeals. [Lee Decl. ¶ 22.] Although Respondents imply that Ghana canceled the travel document as a result of his refusal to board the plane, [*see* Resp. to Pet. at 13 (noting that Ghana

---

[5]   The April 16, 2018 hearing was digitally recorded. Hereafter, the Court will cite to the digital recording using the abbreviation "Hr'g Tr."

11

canceled the document after the September 20, 2016 incident)], the record is insufficient to establish any causal link. There is no indication in the record that Ghanaian officials were even aware of the incident at the Minneapolis-St. Paul airport, let alone that it influenced the cancelation decision. Accordingly, the Court finds that Ghana would have canceled the travel document that had issued for Mr. Sokpa-Anku regardless of his refusal to get on a plane on September 20, 2016.

Finally, the Court rejects the Respondents' argument that Mr. Sokpa-Anku's *pro se* challenges to his removal, including his request with the Ninth Circuit and petition to the United States Supreme Court, support his continued detention. Respondents' counsel asserts that his filings demonstrate Mr. Sokpa-Anku will not comply with removal efforts. [Hr'g Tr. at 9:13–9:16.] However, the Court has identified no support for the proposition that a removable person's attempts to challenge a final order of removal, even if wholly meritless, amount to actions taken "to prevent [his] removal. . . ." *See* 8 U.S.C. § 1231(a)(1)(C). Moreover, since September 26, 2016, ICE has not had a valid travel document from Ghana for Mr. Sokpa-Anku. This fact renders immaterial whether Mr. Sokpa-Anku has filed meritless appeals since then because the United States could not have removed him; the barrier to removal was nothing Mr. Sokpa-Anku did, but the absence of a travel document in the hands of the immigration authorities.

In sum, the Court finds that Mr. Sokpa-Anku has met his initial burden to provide good reason to believe there is no significant likelihood of removal in the

reasonably foreseeable future, and rejects the Respondents' arguments to the contrary. *Zadvydas*, 533 U.S. at 701.

### *Respondents' Burden*

Because Mr. Sokpa-Anku has met his initial burden, Respondents must provide evidence sufficient to rebut that showing. *Zadvydas*, 533 U.S. at 701. For the reasons that follow, the Court finds that the Respondents have failed to meet their burden and there is no reasonable likelihood Mr. Sokpa-Anku will be removed in the reasonably foreseeable future. Under these circumstances, his continued detention violates his constitutional right to due process.

In its initial response to the habeas petition, Respondents asserted that "[t]he Lee Declaration lays out in detail ICE's basis for detaining Petitioner (his non-compliance) and the ongoing nature of the process toward his removal." [Resp. to Pet. at 13.] Further, Respondents stated: "ICE has steadily made progress toward removing [Mr. Sokpa-Anku], and has been reassured as recently as April 26, 2017, that a new travel document will issue." [*Id.*] Since then, in March of 2018, Respondents submitted the Declaration of Officer North, which again asserted that the petition should be denied because Mr. Sokpa-Anku's removal was "imminent." [North Decl. ¶ 21.] However, the Court finds that the Lee and North Declarations fail to provide convincing evidence to show that Mr. Sokpa-Anku is substantially likely to be removed in the reasonably foreseeable future. Neither of these Declarations shows that a travel document has ever been issued for Mr. Sokpa-Anku since September 26,

13

2016. Respondents' insistence throughout the life of this case that a travel document was forthcoming and Mr. Sokpa-Anku was likely to be removed in the reasonably foreseeable future have become less compelling as each prediction has failed to materialize.

The persuasive value of the Lee Declaration suffers, in part, from simply being over a year old. Officer Lee stated, in May of 2017, that Ghana agreed to issue a travel document for Mr. Sokpa-Anku, but it is now more than a year later and no travel document has issued. Such a reality undermines the weight the Court can give to hearsay reports of Ghana's intention to act. The certified records from the Department of Homeland Security provided along with Officer Lee's Declaration also fail to convince the Court that Mr. Sokpa-Anku is any closer to being removed. [ECF No. 12-1.] For example, ICE records show that ICE headquarters was contacted about the re-issuance of a travel document several times after September 26, 2016, and headquarters stated that Ghana intended to issue a travel document when Mr. Sokpa-Anku's post-conviction proceedings concluded at the Minnesota Court of Appeals. [*See* ECF No. 12-1 at 47.] Despite these representations, and other indications in the DHS file that a travel document was forthcoming [*see* ECF No. 12-1 at 49 ,61], it remains conspicuously absent.

Similarly, Officer North's more recently filed Declaration fails to persuade the Court that there is a substantial likelihood that Mr. Sokpa-Anku will be removed in the reasonably foreseeable future. Officer North states that on several occasions

"assistance was requested" from ICE headquarters regarding Mr. Sokpa-Anku's case, but only once is there a vague assurance that "a response was received indicating the travel document was pending a decision by the Embassy of Ghana." [North Decl. ¶¶ 12–13, 15.] Although it can be inferred that the response was received from ICE headquarters, it is entirely unclear on what basis the assertion is made that a request for a travel document was pending a decision. On several prior occasions, Respondents have attempted to convince the Court that Mr. Sokpa-Anku was likely to be removed in the near future based on similar assertions that a travel document would soon be forthcoming, but those attempts have begun to ring hollow. *See Zadvydas*, 533 U.S. at 701 ("[A]s the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future,' conversely would have to shrink.").

Moreover, even though they have access to information about the relationship between the United States and Ghana, the Respondents have provided no evidence in the record demonstrating how or when removals for other Ghanaians are occurring. There is not even general data about how long it typically takes ICE to obtain travel documents from Ghana, so the Court has nothing from which to infer that Mr. Sokpa-Anku will be removed in the reasonably foreseeable future.

For all these reasons, the Court concludes that Respondents have failed to meet their burden under *Zadvydas* to rebut Mr. Sokpa-Anku's showing that there is good reason to believe he will not be removed in the reasonably foreseeable future.

### IV.     Recommendation

Based on the foregoing, **IT IS HEREBY RECOMMENDED THAT:**

1.     Mr. Sokpa-Anku's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 **[ECF No. 1]** should be **GRANTED**;

2.     Respondents should be ordered to release Mr. Sokpa-Anku from detention pending his removal from the United States; and

3.     This matter should be remanded to ICE to allow the agency to establish appropriate conditions for Mr. Sokpa-Anku's supervised release.

Date: June 8, 2018                                                        *s/Katherine Menendez*
                                                                                         Katherine Menendez
                                                                                         United States Magistrate Judge

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.